(No. 4860-

WILLIAM H. DAUM, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed April 21, 1961.*

DRACH AND TERRELL, Attorneys for Claimant.

WILLIAM L. GUILD, Attorney General; WILLIAM H. SOUTH, Assistant Attorney General, for Respondent.

TOLSON, C. J.

On February 26, 1959, William H. Daum, an inmate of the Illinois State Penitentiary at Menard, Illinois, filed his claim against the State of Illinois seeking damages in the amount of $25,000.00 for injuries received by him due to the alleged negligence of the State.

The State did not file an answer, but has defended the claim on the theory that claimant was either guilty of contributory negligence, or had assumed the risk of the work at hand.

Respondent's brief acknowledges that the statement in claimant's brief sets forth the facts of this case in a

proper manner. Subject to certain deletions, they are as follows:

## STATEMENT OF FACTS

"On June 3, 1959, claimant was an inmate of the Illinois State Penitentiary at Menard, Illinois, and was assigned, along with two other inmates, James Blair and Edward Shrake, to the job of removing certain poles and attached electrical wires and cables on the penitentiary grounds in connection with a project, which was then being undertaken by the penitentiary in converting the electrical system at Menard from DC current to underground AC current. A private contractor was employed to install the new system, and the penitentiary undertook to remove the existing poles and wires. At the time in question, one Oscar Marquadt was the Chief Engineer at the institution, and, as such, was in charge of the work to be performed by the penitentiary. One George McVicker was Marquadt's assistant. Charles Brown was employed by the State as an electrical foreman at the penitentiary, and was responsible to Marquadt and McVicker. He was given the responsibility of the immediate supervision of the removal of the poles and wires in question.

"Approximately two weeks before June 3, Oscar Marquadt had a conversation with inmate James Blair, who had been working for many years on what was called the electrical crew, in which he ordered Blair and his crew to perform the job of removing the poles and wires then existing on the premises of the penitentiary. Although claimant had been for many months prior to that date closely associated with Blair and inmate Edward Shrake in the performance of electrical work in and about the penitentiary, both as a welder and as an electrician, Daum was on said date not officially assigned to the work of electrical maintenance as were Blair and Shrake. He was at that time officially assigned to the welding shop, a division of the machine shop, over which Marquadt, as Chief Engineer, had supervision. At or about the time Marquadt directed Blair to undertake the removal of the wires and poles, claimant and Blair requested Charles Brown to arrange for Daum's assignment from the welding shop to the electrical crew, in order that he, Daum, might officially be a part of that group of persons, who were concerned with and assigned to the job of performing electrical work on the penitentiary grounds.

"Although Charles Brown, as electrical foreman, was the immediate supervisor of Blair, Shrake and Daum in connection with this project, the work of removing the poles and lines was not considered as being part of the routine or normal work of the electrical crew, but, rather, was regarded as a wrecking job, to which claimant Daum, as a welder, might properly be assigned.

"All of the officers and other persons testifying at this hearing agree that at some date within the two weeks prior to June 3, 1959, claimant Daum was officially assigned to work with Shrake and Blair under the supervision of the electrical foreman, Charles Brown. Brown at all relevant times herein had the authority to use inmates assigned to various departments in the

machine shop, whether assigned specifically to his department or not, without formal reassignment, when such inmate was not engaged in performing work in the department to which he was then assigned. Brown testified that, during the period in question, his electrical crew was shorthanded, and that Daum had little welding work to do at that time.

"On or about May 20, 1959, when inmate Blair was told to perform this job, he was instructed by Marquadt to remove the wires from the poles before taking the poles down. When Blair suggested pulling the poles down before removing the wiring, Marquadt stated that it would not be necessary to do this, because all of the poles involved were reinforced with railroad iron. Marquadt had been in the penitentiary for a number of years, and was regarded by all those persons under his supervision as an engineer, who knew or should have known the proper manner of removing the existing system of wiring. During the period between May 20 and June 3, electrician Charles Brown recommended to Marquadt that, in the interest of safety, a derrick be used to support the poles while the wiring was being taken from them; but Marquadt insisted that all of the poles were reinforced with railroad iron, and that his prescribed method of removal was entirely safe.

"Although Blair, Shrake and Daum were under the immediate supervision of Charles Brown, it appears that Brown was not continuously on the job site, and that he only visited the job site on and off. The testimony ranges from two times throughout the two week period prior to June 3 to 50 times a day. The latter is Brown's estimate. Brown instructed Daum in the use of a safety belt in connection with ascending the poles.

"On June 3, 1959, between the hours of 11:00 A.M. and noon, Daum ascended a 25 foot iron pole situated approximately 150 feet from the wall of the penitentiary for the purpose of cutting the messenger cable, which was secured by a bracket on that pole. The messenger cable consisted of a round lead cable of a diameter of some one to two inches within which ran a large number of smaller wires, and on top of which was a metal loop through which an additional steel cable ran. When Daum reached the level of the messenger cable, which was approximately 20 feet above the ground, he fastened his safety belt around the pole, looping the belt around one arm of the cross arm in the manner that he had been instructed or directed to do by the electrical foreman, Charles Brown. Daum flattened out the messenger cable, and was reaching back to get his cutters when the whole cable began to slide through the bracket attached to the pole, by reason of the cable having been severed near the prison wall, or at some other point between Daum's pole and the wall. Daum's pole then began to jerk, and, upon being warned by Chief Guard Lence that the pole was beginning to fall, Daum attempted to unhook his safety belt. Being unable to unhook it in time, Daum attempted to get around on top of the pole, so that he would not be pinned by it upon falling. Before this was done, the pole and Daum hit the ground, the pole falling on Daum's right elbow, right thigh and left leg between the knee and the ankle. He was pinned in that position for three or four minutes, until Blair and Lence removed him from underneath the pole after unhooking his safety belt.

"Daum had never done any electrical work prior to his incarceration at Menard; and, except for the experience obtained by him through working with Blair and Shrake at the penitentiary in connection with several wiring jobs, he was inexperienced in electricity. He had no prior experience in removing pole and wiring systems. With the exception that he had been instructed as to the proper use of the safety belt when ascending and working on the poles, he received no special instructions as to the manner in which the poles and wiring were to be removed from any officer or employee of the penitentiary. Although Blair, by virtue of his having been on the electrical crew for many years, was expected to take the lead in supervising the activities of Daum and Shrake, he was clothed with no official supervisory capacity.

"At the time of the accident, the messenger cable was strung on several poles running from the south wall of the penitentiary at a point to the east of the main cellblock to a pole immediately inside the wall at that point; thence in a northwesterly direction to a pole located near the machine shop, which pole is located immediately inside the wall, and is identified as pole number 2; thence generally west to the pole, which broke with claimant, which pole is designated as pole number 3; and, thence west to several other poles, running parallel to Front Street.

"Immediately prior to the accident, Charles Brown, the electrical foreman, was in the vicinity of pole number 1, and at that time, after having requested that Blair obtain some wire cutters for him, severed the messenger cable at the wall. Although Brown testified that he severed this line that morning, but some time before the accident occurred, the great preponderance of evidence is that the line was cut by Brown immediately before the pole fell. It was the strain caused upon the system by reason of the unsecuring of this line, which had acted as a guying support for all poles in the system, which caused the pole upon which Daum was working to be subjected to a force and strain, which the pole, in its weakened and aged condition, was unable to withstand. Shrake, who was in the vicinity of the pole upon which Daum was working, and who had a clear view of the place where Charles Brown and another inmate were working at the wall, testified that he saw Brown cut the cable immediately before the poles fell. Blair testified that he had a conversation with Brown immediately before the poles fell, in which Brown had requested wire cutters, and had informed Blair that he was going to cut the messenger cable at the wall. Immediately after the accident, he observed that the cable was cut at the wall. There is no other accounting for the sudden falling of the pole, since there was no evidence introduced showing that any other undue strain had been placed upon the system. Several days before, Blair had ascended the same pole, and had removed a transformer of a weight of approximately one thousand pounds.

"At or about the time that the project of removing the poles and lines began, Charles Brown recommended to the Chief Engineer, Oscar Marquadt, that a derrick be used to support the poles, since the poles were old and in a weakened condition, pointing out that the use of a derrick as a support would lessen the danger to the inmates working on the poles. Brown was at that time assured that no danger existed, because all of the poles on the grounds

were reinforced with railroad iron. Acting upon the assumption that the poles were in fact so reinforced, Brown did not use any means of giving support to the poles, although he admitted that measures could have been taken to support them by guying the poles, by using an A-Frame and by using a derrick. Furthermore, Brown testified that neither he nor any other officer took any steps to determine whether any of the poles were, in fact, reinforced with railroad iron or any other metal.

"As a matter of fact, neither the pole upon which Daum was working, nor any of the poles, which fell with it at the time of the occurrence in question, were reinforced with railroad iron or any metal.

"Although Brown was the immediate supervisor of the crew engaged in taking the poles down, and had himself arranged the assignment of Daum to this crew, and, although he was on the job site many times a day, he testified that he had never seen Daum working on a pole. However, this is disputed by the testimony of Captain Lewis C. Lence, Assistant Chief Engineer George McVicker and Chief Guard Max P. Frye, all of whom had seen Daum working on poles on many occasions throughout the two week period preceding the date of the accident, and the testimony of inmates Edward Shrake and James Blair, both of whom stated that Daum worked on poles every day during this period, and during times when Brown was present. The testimony of claimant, who was given a safety belt by Brown, refutes this assertion, as does much of the testimony of Brown himself.

"None of the poles were ever examined or tested for strength, even though the poles were rusted at the bases, and were known by officers of the institution to be 35 or 40 years old.

"Not only were the poles not inspected or examined with reference to determining the extent of internal reinforcemnt by any responsible guard, officer or employee of the penitentiary, but all attempts made by inmates Blair, Shrake or Daum to have the poles tested for strength were refused by Brown, who on each occasion stated that no need existed for testing the poles, since they were all reinforced with railroad iron.

"Officer Brown testified that no safeguards were taken to prevent poles from falling while inmates were working on them. He further testified that, although it would have been good practice to guy the poles to provide additional support, he took no such measures. He testified, based upon his years of experience, that it would have been good practice to have provided three guy wires for each pole.

"As the result of Daum's fall and his being pinned under the fallen pole, Daum sustained a displaced fracture of the olecranon of the right elbow with considerable fragmentizing or splitting of the bone, a simple fracture with displacement of the tibia of the left leg, and a fracture of the left pubic ramus. The elbow fracture was treated initially by surgery, consisting of an open reduction of the fracture with the insertion of a 4½ inch screw.

"The arm was immobilized, and some weeks later an operation was performed, wherein the screw was removed. The testimony of the physicians testifying in this case is that Daum had sustained a permanent injury to his

right arm, in that he now has and will continue to have only 40 to 50 per cent use of that arm.

"The fracture of the tibia in the left leg was treated by open reductión of the fracture and the insertion of a Rush Nail. The leg was thereafter immobilized, and some weeks later surgery was performed in which the nail was removed. Although the fracture of the bone has completely healed, the fracture of the left leg has resulted in a shortening of that leg by 1⅜ inches, so that a two inch built-up heel must be worn by claimant at the present time in order to permit even walking and to reduce strain upon the hip. The disability is not correctible by further surgery, and the medical testimony is that traumatic arthritis will be expected to set in. That this has already happened is borne out by the testimony of Daum that he experiences pain in his leg during damp weather.

"Daum was hospitalized for seven months at Menard, and is still unable to perform any work requiring the full use of his right arm or standing for any length of time. Daum's testimony with reference to the acute pain experienced by him for the first weeks following the injury is borne out by the testimony of Dr. James Weatherly, who testified that acute pain would be experienced the first ten or fourteen days after the accident, and that soreness would be experienced for four or five weeks thereafter."

This case was argued orally before the Court.

As to the charge of negligence, the Court finds that Oscar Marquadt, Chief Engineer, was entirely mistaken when he advised his subordinates that the poles were reinforced with steel. As to the time when the messenger cable was cut, we believe that the preponderance of the evidence indicates that the cable was cut while claimant was working on the pole, rather than Brown's testimony that it was cut earlier in the morning. The best evidence in this regard is the fact that all three poles fell at the same time.

The Court, therefore, finds from the evidence that respondent was negligent in failing to provide safe working conditions for claimant.

Respondent's contention that claimant was guilty of contributory negligence, and assumed the risk of the job at hand, is not supported by the evidence. We do not believe that claimant should be penalized for his willingness to work. Since he was using a safety belt, in accordance with instructions, we do not find any evidence of

foolhardiness, or unnecessary exposure to danger on his part. *Moore* vs. *State of Illinois,* 21 C.C.R. 282.

It is unnecessary to restate the injuries received by claimant. They were severe and of a permanent nature. The medical testimony supports the claim that he will be impaired in obtaining gainful employment when he is discharged from the prison.

The Court, therefore, finds that claimant has suffered damages in the amount of $20,000.00.

An award is, therefore, made to claimant, William H. Daum, in the amount of $20,000.00.